# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION AT COLUMBUS

DEVON BIAS,

|                | Petitioner, | : | Case No. 2:23-cv-02313 |

- vs -

District Judge Sarah D. Morrison
Magistrate Judge Michael R. Merz

WARDEN, Lebanon Correctional
   Institution,

:

Respondent.

# REPORT AND RECOMMENDATIONS

This is a habeas corpus case brought *pro se* by Petitioner Devon Bias seeking relief from

his convictions in the Franklin County Court of Common Pleas for murder, discharging a firearm,

attempted murder, felonious assault, and having weapons while under disability (Petition, ECF

No. 1).  Relevant pleadings are the Petition (ECF No. 1), the State Court Record (ECF No. 15),

the Return of Writ (ECF No. 16), and Petitioner's Reply (ECF No. 25).

**Litigation History**

The offenses of which Petitioner was convicted occurred on December 4, 2017.  *State v.

Bias*, 2022-Ohio-4643, ¶ 2. (Ohio App. 10th Dist. Dec. 22, 2022).  He was indicted on December

28, 2017, with co-defendant Darnell Vinson and charged with four counts of murder in violation

1

of Ohio Revised Code § 2903.02, one count of discharging a firearm at or into a habitation or school safety zone in violation of Ohio Revised Code § 2923.161, three counts of attempted murder in violation of Ohio Revised Code § 2923.02, three counts of felonious assault in violation of Ohio Revised Code § 2903.11, and one count of having weapons while under disability in violation of Ohio Revised Code § 2923.13. All but the having weapons while under disability count included firearm, drive-by shooting, and criminal gang activity specifications. (Indictment, State Court Record, ECF No. 15, Exhibit 1). On February 17, 2021, Bias waived his right to a trial by jury and elected a bench trial. (State Court Record, ECF No. 15, Exhibit 19). Bias was convicted on all counts and sentenced to thirty-five years to life in prison (Amended Judgment Entry, State Court Record, ECF No. 15, Ex. 21).

Through new counsel, Bias appealed to the Ohio Tenth District Court of Appeals which affirmed. *Bias, supra.* The Ohio Supreme Court then declined jurisdiction. *State v. Bias*, 169 Ohio St.3d 1501 (2023). Bias then filed the instant Petition for Writ of Habeas Corpus, pleading the following Grounds for Relief:

> **Ground One**: The Confrontation Clause and/or Fed. Evid. R. 804 require a prosecutor to make a good faith effort to utilize a statutory remedy for compelling the testimony of an uncooperative witness. (i.e. a material witness warrant or contempt of court) Trial Prosecution did not.
>
> **Supporting Facts:** At trial the prosecutor in petitioner's case violated petitioner's Confrontation Clause within Fed. Evid. Rule 804 when he purposely failed to use "other reasonable means" to procure the only said witness testimony. The prosecution after serving a subpoena and hearing the witness say he "was not going to testify" only used words to "persuade" the witness to testify. The confrontation clause and Fed. Evid. R. 804 (A)(5) require more than that from the prosecution (i. e. a material witness warrant or contempt of court).

2

**Ground Two**: The Confrontation Clause and/or Fed. Evid. R 804 require a prosecutor to demonstrate that a defendant directed a third-party to threaten a witness before the third-party's conduct may be imputed to the defendant for purposes of admitting the witness's unconfronted testimonial statements against him pursuant to the forfeiture-by-wrongdoing exception. Trial prosecution did not.

**Supporting Facts:** The witness in petitioner's case told his probation officer that he "was not going to testify" against Bias after receiving anonymous text messages and a telephone call stating that "if he testified he would be dead by Friday. " The state never proved Bias made these threats. Jaw.L.'s probation officer testified that Jaw.L. "had no idea" who the threatening caller was. (04/12/21 Tr. 16)

The court of appeals skirted the issue by ruling that a letter ostensibly written by Bias (petitioner) regarding a scheme to kidnap the witness supported a finding of wrongdoing under Fed. Evid. R 804(b)(6). (Decision at 1186) However Jaw.L.'s probation officer testified that the witness had already made the decision not to testify and disobey the subpoena after receiving anonymous threats.) (*Id.* at 67). Both the probation officer and the Detective Vass (detective on case) admitted that no attempt was made to preserve the screenshots of the text message or obtain the number that is always on the top of a text message. (Id. at 21, 48-49) Therefore, the admission of Jaw.L.'s unconfronted statements into evidence violated Rule 804(B)(6) and petitioners' rights under the Confrontation Clause.

**Ground Three**: The Confrontation Clause and/or Fed. Evid. R. 801(D)(l)(c) preclude the admission of an unavailable witness's prior identification of a defendant even if the witness's unavailability resulted from the defendant's alleged wrongdoing.

**Supporting Facts:** Fed. Evid. R. 801(D)(l)(c) does not incorporate forfeiture-by-wrongdoing language similar to the Rule 804(B)(6) exception. So because Jaw.L. did not testify at trial and was not subjected to cross examination, the admission of his inconsistent identification of petitioner from the photo array was barred by Evid. R. 802, the hearsay exclusionary rule, and violated Petitioners Sixth Amendment rights. This error was not harmless beyond a reasonable doubt. The court of appeals deprived petitioner of his right to a fair appellate review when it overruled his second assignment of error without even bothering to address this issue.

**Ground Four**: A photo lineup identification procedure is unnecessarily suggestive and violates a defendant's rights under the Due Process Clause of the Fourteenth Amendment when the administrator insinuates that the photo array contains the perpetrator's image and steers the witness into selecting the defendant's image.

**Supporting Facts:** After Jaw.L. told the detective who administered the identification procedure that photographs 1, 2, 4 and 6 looked "familiar" to him, the detective asked "your referencing number 6 [Petitioners image] there/ can you say that is, is not, or you aren't sure about any?" There was no reason why the detective needed to highlight the fact the witness referenced number 6, and by only highlighting only one of the four photographs, the detective improperly steered the witness into selecting petitioner's photograph. This identification was unreliable. Its admission into evidence violated petitioners right to Due Process. This violation was not harmless beyond a reasonable doubt.

**Ground Five**: A trial judge's participation in a Crim. R. 16(F) certification hearing and/or initiation of his own investigation into a defendant's alleged culpability for the unavailability of a state's witness violate a defendant's right to an unbiased judge under the Due Process Clause of the Fourteenth Amendment, and rise[s] to the level of structural error.

**Supporting Facts**: The Trial judge conducted an in camera hearing on the prosecution's certification of non-disclosure of discovery relating to witness Jaw.L.. The Ohio State Supreme court has held that when a trial judge hears evidence of an attempt to harm, coerce or intimidate a witness during a Rule 16(F) hearing, "there is an unnecessary risk that the judge will harbor a bias against the defendant. " *State v. Gilliard*. 40 Ohio St. 3d 226, 228, 553 N. E. 2d 272 (1998). At the conclusion of the subsequent forfeiture-by-wrongdoing hearing/ the trial judge announced that he had examined a handwritten motion to dismiss that was filed in the case by the petitioner (Bias) pro se, and concluded that the handwriting on this document matched the handwriting of the unsigned letter received by Jaw.L.. This conduct violated Jud. Con. Rule 2. 9(C) which states that "a judge shall not investigate facts in a matter independently." An Eighth District appellate panel recognized that "the likelihood of prejudice due to judicial bias increases dramatically when the judge is the trier of fact. " *Id*. 8th Dist. Cuyahoga No. 105455, 2019-0hio-4973, 149 N. E. 3d 1120. (This petitioners' case at hand was a bench trial). The Due Process Clause guarantees a defendant a "fair trial in a fair tribunal before a judge with no actual bias against the

defendant. " *Bracy v. Gramley*, 520 U. S. 899, 905, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). Petitioners' [sic] trial judge had an actual bias against him due to his exposure to prejudicial information during the certification hearing, and his independent investigation of the facts during the forfeiture-by-wrongdoing proceedings.

**Ground Six**: A trial judge's failure to inform a defendant of his participation in a Crim. R. 16(F) certification hearing (that was conducted without the defendant's knowledge and presence) prior to asking a defendant to reaffirm his jury trial waiver violates the right to trial by jury under the Sixth and Fourteenth Amendments to the United States Constitution, and rises to the level of structural, or alternatively plain, error.

**Supporting Facts:** The trial judge accepted Bias' waiver of his right to a jury trial on Feb 17/2021 (02/17/21 Tr. 15-27) (several weeks prior to the commencement of the bench trial) at the conclusion of that proceeding the trial judge told the petitioner that the scheduled certification hearing was "[j]ust dealing with a technicality we've got to deal with that day, okay?"(02/17/21 Tr. 28, emphasis supplied). The trial judge never once informed the defendant what the Crim. R. 16(F) certification hearing would consist of before or after the hearing. In the interim of the waiver and the bench trial/ the judge conducted a Crim. R. 16(F) certification hearing in Bias' absence. On the first day of trial the prosecutor asked petitioner whether "it's still his intention to waive jury and go forward with a bench trial?" The trial judge still failed to disclose that his participation in the Crim. R. 16(F) certification hearing created grounds for disqualifying him under Ohio Law. The petitioner reaffirmed the jury waiver without knowing critical information. The Ohio Constitution guarantees that the right to trial by jury "shall be inviolate" and any waiver of this right in a felony case must satisfy the requirements of being knowing, voluntary and intelligent. It is also reasonably probable that petitioner would have refused to confirm his jury waiver if he had been informed that grounds existed for automatically disqualifying the judge under Ohio law/ seeing as though that would make the judge a biased fact finder. This probability is sufficient to justify relief under the plain error standard.

**Ground Seven**: A conviction for a gang specification statute (R. C. 2941.142) that is not supported by some evidence that the predicate violent felony was gang-related violates a petitioners' rights under the Due Process Clause of the Fourteenth Amendment.

5

**Supporting Facts:** The gang specification statute requires proof that the defendant committed a violent felony "while participating in a criminal gang" R. C. 2941. 142. The state did not offer evidence that the event precipitating the shooting-road rage-was "gang related". In closing argument, the prosecutor even conceded "there is nothing in the record that shows it's anything but a random shooting. " Petitioners convictions for the gang specifications violated his rights under the Due Process Clause of the Fourteenth Amendment.

**Ground Eight**: A conviction that rests upon an identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, violates a petitioners' rights under the Due Process Clause of the Fourteenth Amendment.

**Supporting Facts**: The court of appeals ruled that the trial judge was in the "best position" to assess the reliability of Jaw.L.'s photo identification of Bias as one of the shooters, and that his findings as to the element of identity was entitled to "great deference" by a reviewing court. (Decision, at 1140) But Jaw.L. did not testify. Therefore, the trial judge was in no better position than the court of appeals to review the recordings of Jaw.L.'s police interview and the photo lineup procedure and determine the adequacy of the identification. Due to the fact that Jaw.L. stated he never saw the face of the shooter he "just saw what he was wearing" (State's Exhibit Y-l at 1:04:05 to 1:04:10, emphasis supplied) and his many uncertainties about his opportunity to view the shooters and the ability to make an identification, Petitioners convictions violated his rights under the Due Process Clause of the Fourteenth Amendment. For these additional reasons the court of appeals erred when it denied Bias' first assignment of error.

**Ground Nine**: The cumulative effect of multiple violations of the rules of evidence can be so prejudicial as to rise to the level of a violation of a petitioners' rights under the Due Process Clause of the Fourteenth Amendment.

**Supporting Facts:** During the bench trial, the judge permitted the prosecution to offer 1) a detective's testimony and a photograph placing Bias in possession of an unrelated semiautomatic handgun that plainly violated the prohibition against propensity evidence under Evid. R. 404(b) and R. C. 2945. 59; 2) irrelevant hearsay testimony that Petitioner was a member of a gang and participated in a pattern of criminal gang activity; and 3) the prior testimony of its forfeiture-by-wrongdoing witnesses without first demonstrating their unavailability under Evid. R. 804(A). Because the cumulative

6

effect of these evidentiary errors deprived the petitioner of his constitutional right to Due Process, the court of appeals erred when it overruled Petitioners fifth assignment of error.

**Ground Ten**: A remand for proper ruling is mandatory when a trial court denies a Sixth Amendment speedy trial motion without first engaging in a balancing of the four factors under *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

**Supporting Facts:** A court must balance four factors - the length of delay, the reason for the delay, the defendant's assertion of his rights, and the prejudice to the defendant - when ruling on a motion to dismiss for a violation of the Sixth Amendment right to a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182/ 33 L. Ed. 2d 101 (1972). After a year had passed since petitioners [SIC] arrest/ his first attorney filed a motion to dismiss the indictment on the ground that the delay in bringing him to trial violated his constitutional right to a speedy trial. The trial court denied the motion without balancing the four Barker factors. The proper remedy for such a violation is a remand "for the entry of a proper order pursuant to Barker. " *Higgenbottom v. State,* 288 Ga. 429/ 430-31/704 S. E. 2d 786 (2011). For these reasons petitioner was denied his Sixth Amendment right to a speedy trial.

**Ground Eleven**: A reviewing court must consider the cumulative effect of an attorney's errors when adjudicating a petitioner's claim that he was deprived of his Sixth and Fourteenth Amendment right to the effective assistance of counsel.

**Supporting Facts:** Petitioner raised an assignment of error identifying four categories of ineffective assistance by his attorney prior to and during trial: l)Failing to object to the trial judge presiding over the certification hearing, (2) failing to request that the petitioner be apprised of the judge's involvement in the certification hearing prior to the reaffirmation of his jury waiver, (3) failing to object to the prosecutor's use of leading questions during the forfeiture- by- wrongdoing hearing, and (4) failing to object to the testimony and photograph regarding petitioners prior possession of a handgun and the testimony about petitioners participation in a pattern of gang-related criminal conduct.  (Decision, at 158).

*Hewitt-EL v. Burgess*, 53 F. 4th 969, 982 (6th Cir. 2022) States that a reviewing court must consider the cumulative effect of an attorney's errors when ruling on Sixth Amendment ineffective assistance of counsel claim. The court of appeals did not do this. Instead, it denied the assignment of error based on its erroneous determination that each category of deficient performance by trial

7

> counsel did not result in prejudice. For these additional reasons
> petitioner was denied his Sixth and Fourteenth Amendment rights to
> the effective assistance of counsel.

(Petition, ECF No. 1, PageID 16-23).

# Analysis

**Procedural Default**

Respondent asserts that Petitioner's Fifth, Sixth, a portion of his Ninth, and his Tenth

Grounds for Relief are procedurally defaulted and therefore barred from merits review (Return, ECF

No. 16, PageID 1753).

### General Standard

The procedural default doctrine in habeas corpus is described by the Supreme Court as

follows:

> In all cases in which a state prisoner has defaulted his federal claims
> in state court pursuant to an adequate and independent state
> procedural rule, federal habeas review of the claims is barred unless
> the prisoner can demonstrate cause of the default and actual
> prejudice as a result of the alleged violation of federal law; or
> demonstrate that failure to consider the claims will result in a
> fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406

(6th Cir. 2000). That is, a petitioner may not raise in federal habeas a federal constitutional rights

claim he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S.

72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). "Absent cause and prejudice, 'a federal

habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal

habeas corpus review.'" *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000), quoting *Gravley v.*

*Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87.

> [A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule. E.g., *Beard v. Kindler*, 558 U.S. 53, 55, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009).  This is an important "corollary" to the exhaustion requirement. *Dretke v. Haley*, 541 U.S. 386, 392, 124 S.Ct. 1847, 158 L.Ed. d 659 (2004).  "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address" the merits of "those claims in the first instance."  *Coleman* [*v. Thompson*], 501 U.S. [722,] 731-732, 111 S.Ct. 2546, 115 L.Ed.2d 640 [(1991)].  The procedural default doctrine thus advances the same comity, finality, and federalism interests advanced by the exhaustion doctrine.  See *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

*Davila v. Davis*, 582 U.S. 521, 527 (2017). "[A] federal court may not review federal claims that were procedurally defaulted in state courts." *Theriot v. Vashaw*, 982 F.3d 999 (6th Cir. 2020), citing *Maslonka v. Hoffner*, 900 F.3d 269, 276 (6th Cir. 2018) (alteration in original) (quoting *Davila v. Davis*, 582 U.S. 521, 527(2017)).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default*. Barton v. Warden, S. Ohio Corr. Facility,* 786 F.3d 450, 464 (6th Cir. 2015), *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir. 2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>             . . . .

9

> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); accord, *Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007), *quoting Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). A habeas petitioner can overcome a procedural default by showing cause for the default and prejudice from the asserted error. *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015).

**Ground Five: Judicial Bias**

In his Fifth Ground for Relief, Bias asserts he was deprived of his right to trial before an impartial judge by Judge Holbrook's participation in an Ohio Crim. R. 16(F) certification hearing and/or by his initiation of his own investigation into Bias's alleged culpability for the unavailability of a state's witness.

Bias raised this claim as his Third Assignment of Error on direct appeal and the Tenth District decided it as follows:

> {¶ 102} Appellant's third assignment of error alleges two instances of judicial bias: (1) the trial court's participation in the pre-trial *in camera* certification hearing conducted under Crim.R 16(F), and (2) the trial court's independent examination of the pro se motion to dismiss at the Evid.R. 804(B)(6) hearing. Appellant maintains that these acts constitute reversible structural error. We disagree.

{¶ 103} "A structural error is a violation of the basic constitutional guarantees that define the framework of a criminal trial." *State v. West*, 169 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, ¶ 2. "Structural error has been recognized only in limited circumstances involving fundamental constitutional rights, including the denial of counsel to an indigent defendant, the denial of counsel of choice, the denial of self-representation at trial, the denial of a public trial, and the failure to instruct the jury that the accused's guilt must be proved beyond a reasonable doubt." *Id.* at ¶ 26, citing *Weaver v. Massachusetts*, 582 U.S. 286, 137 S.Ct. 1899, 1908, 198 L.Ed.2d 420 (2017). In addition, the " '[t]he presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error.' " *State v. Pippins*, 10th Dist., 2020-Ohio-503, 151 N.E.3d 1150, ¶ 69, quoting *State v. Sanders*, 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001), citing *Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{¶ 104} "The term ' "bias" ' implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State v. Skerkavich*, 8th Dist., 2019-Ohio-4973, 149 N.E.3d 1120, ¶ 24, quoting *In re Disqualification of O'Neill*, 100 Ohio St.3d 1232, 2002-Ohio-7479, 798 N.E.2d 17, ¶ 14, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 469, 132 N.E.2d 191 (1956). " '[T]he threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the [trial] court's conduct falls demonstrably outside this range so as to constitute hostility or bias.' " *Id.,* quoting *State v. Cepec,* 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 74, citing *McMillan v. Castro,* 405 F.3d 405, 410 (6th Cir. 2005). "It is the burden of the accused * * * to demonstrate that the judge became biased or that the judge participated so continuously in the investigation and was exposed to such prejudicial information that bias would be perceived by an objective observer reviewing the case." *Pippins* at ¶ 71.

{¶ 105} Structural error "is not susceptible to harmless-error review but rather, when an objection has been raised in the trial court, is grounds for automatic reversal." *West* at ¶ 2, citing *State v. Jones,* 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 2, 20. "But when the accused fails to object to the error in the trial court, appellate courts apply the plain-error standard of review, shifting the burden to the accused to demonstrate that the error affected the trial's outcome." *Id.*, citing *Jones* at ¶ 17.

11

{¶ 106} We first consider appellant's Crim.R. 16(F) argument. Crim.R. 16 addresses discovery and inspection of the prosecution's evidence by a defendant. Crim.R. 16(D)(1) specifically states: "If the prosecuting attorney does not disclose materials or portions of materials under this rule, the prosecuting attorney shall certify to the court that the prosecuting attorney is not disclosing material or portions of material otherwise subject to disclosure under this rule for one or more of the following reasons: (1) The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion" [or] * * * (5) "[t]he interests of justice require non-disclosure." Crim.R. 16(D)(1), (D)(5).

{¶ 107} Upon a defendant's motion, the trial court must hold an *in camera* hearing seven days prior to trial. Crim.R. 16(F). If the trial court finds an abuse of prosecutorial discretion, then the prosecutor must immediately disclose the material. *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 52, citing 2010 Staff Note, Crim.R. 16(F). Otherwise, the material must be disclosed "no later than commencement of trial." *Id.,* citing Crim.R. 16(F)(5).

{¶ 108} In the present case, the prosecution certified non-disclosure of materials relating to Jaw.L.'s statements to the police and photo array identification. As reasons for the non-disclosure, the prosecution asserted that it had reasonable, articulable grounds to believe that disclosure would compromise Jaw.L.'s safety and that the interests of justice required non-disclosure.

{¶ 109} In accordance with Crim.R. 16(F), the trial court held an *in camera* certification hearing seven days prior to trial. No witnesses were called at the hearing. Although appellant was not present, defense counsel appeared on his behalf. The prosecution discussed appellant's and Vinson's membership in the Deuce Deuce Bloods, and described the gang as "one of the most dangerous gangs here in Franklin County." (Apr. 12, 2021 Hearing Tr. at 3.) The prosecution further stated that the Deuce Deuce Bloods had been involved in multiple homicides, that Vinson had been personally responsible for more than ten homicides, and that appellant had access to other gang members while in jail. In addition, the prosecution stated that the three surviving occupants of the Honda CR-V, including Jaw.L., had been threatened and were afraid to testify. The prosecution averred that, with the redaction of Jaw.L.'s name, it had provided the defense a summary of Jaw.L.'s first interview with the police and a summary of his selection of appellant from a photo array; however, the prosecution had not provided the defense with either a summary of

Jaw.L.'s second police interview or the audio-recording of the photo array procedure. The prosecution acknowledged that defense counsel had already determined Jaw.L.'s identity; however, it sought certification to protect Jaw.L.'s identity from appellant until the start of trial.

{¶ 110} At the conclusion of the hearing, the trial court found that the prosecution had demonstrated reasonable, articulable grounds to believe that disclosure would compromise Jaw.L.'s safety or subject him to intimidation or coercion. On April 16, 2021, the court issued a sealed entry memorializing its oral decision.

{¶ 111} In *State v. Gillard*, 40 Ohio St.3d 226, 533 N.E.2d 272 (1988), the Supreme Court of Ohio held that "when the state seeks to obtain relief from discovery or to perpetuate testimony under Crim.R. 16(B)(1)(e) [now addressed under Crim.R. 16(D)(1)], the judge who disposes of such a motion may not be the same judge who will conduct the trial." *Id.* at paragraph one of the syllabus. *Gillard* adopted this rule because "when a judge hears information that a defendant has attempted to harm, coerce, or intimidate an opposing witness, there is an unnecessary risk that the judge will harbor a bias against that defendant." *Id.* at 229, 533 N.E.2d 272. Appellant contends that his case falls within the syllabus rule of *Gillard* and, as such, the trial judge who presided over the certification hearing had a duty to sua sponte recuse himself from presiding over the trial and his failure to do so constitutes reversible structural error.

{¶ 112} Initially, we note that the Supreme Court of Ohio has determined that a violation of the *Gillard* rule is not structural, as the holding in that case was not based on any constitutional provision. *State v. Esparza*, 74 Ohio St.3d 660, 661-62, 660 N.E.2d 1194 (1996). Moreover, even if the error could be classified as structural constitutional error, we find no indication that the trial judge in this matter exhibited bias against appellant in presiding over both the certification hearing and the bench trial. Accordingly, structural analysis is not invoked. *Pippins*, 10th Dist., 2020-Ohio-503, 151 N.E.3d 1150, at ¶ 75. Even if structural analysis were invoked, appellant neither raised the issue that the certification matter should be heard by another judge nor objected to the judge presiding over the bench trial. As such, appellant has forfeited all but plain error. *West*, 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, at ¶ 28. (Assertions of structural error do not preclude an appellate court from applying the plain-error standard when the accused has failed to object.) *See also State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 66. ("[T]he plain-

error rule still applies to errors that were never objected to at trial, even if those errors can be classified as structural.").

{¶ 113} Under the plain error standard of review, the accused bears the burden of " 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.' " *West* at ¶ 22, quoting *State v. Quarterman,* 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. "An appellate court has discretion to notice plain error and therefore 'is not required to correct it.' " *Id.*, quoting *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 23.

{¶ 114} Appellant argues that but for obvious error in the trial court presiding over both the Crim.R 16(F) hearing and the bench trial, the outcome of the trial would have been different. Appellant maintains this is so because the evidence against him was "far from overwhelming." (Appellant's Am. Brief at 38.) Appellant argues that the uncertainties surrounding Jaw.L.'s pretrial identification of appellant resulted in only "extremely weak proof on the element of identity," and that the "insertion of a biased fact-finder into the trial created a probability of prejudice sufficient to undermine confidence in the guilty verdicts of the trial judge." (Appellant's Am. Brief at 38.)

{¶ 115} In our resolution of appellant's first assignment of error, we considered and rejected appellant's arguments regarding Jaw.L.'s pretrial identification of appellant as the shooter. Further, appellant's argument fails to acknowledge the presence of his DNA on the hat found at the scene. In addition, appellant's argument assumes bias on the part of the trial judge in presiding over both the certification hearing and the bench trial. As noted above, we discern no evidence of judicial bias in that regard.

{¶ 116} We likewise find no evidence of judicial bias in the trial court's independent examination of the pro se motion to dismiss at the Evid.R. 804(B)(6) hearing. As noted above, after announcing its conclusion that the handwriting in the motion to dismiss appeared to match that in the letter Jaw.L. received via text message, the trial court invited argument. Appellant argued that the motion constituted "extrinsic evidence," that it was "not marked * * * for appeal purposes," and that it constituted "expert testimony." (Apr. 21, 2021 Tr. at 75.) However, appellant did not object on the grounds he now raises on appeal, i.e., that the trial court's handwriting comparison demonstrated judicial bias. " 'Objection on one ground does not preserve another, unmentioned grounds.' " *State v. Hairston,* 10th

14

Dist., 2016-Ohio-8495, 79 N.E.3d 1193, ¶ 34, quoting *State v. Wallace*, 10th Dist. No. 08AP-2, 2008-Ohio-5260, 2008 WL 4518016, ¶ 25. As noted above, failure to object results in forfeiture, even when the error would otherwise be structural. *McAlpin* at ¶ 66. Thus, appellant's judicial-bias argument is subject to plain error review.

{¶ 117} Even if appellant had preserved the judicial-bias argument, appellant cannot demonstrate any error, much less plain error. The trial court's decision to compare the letter with the motion does not evince any "hostile feeling or spirit of ill will" against appellant. *Skerkavich*, 8th Dist. No. 105455, 2019-Ohio-4973, 149 N.E.3d 1120, at ¶ 24. Just the opposite, the trial court indicated its intention was to benefit appellant by making the comparison. Indeed, the trial court explained that the letter, "on its face without the comparison" indicated that appellant was the author. (Apr. 21, 2021 Hearing Tr. at 76.) The trial court averred that it compared the handwriting in the documents "in an interest of protecting [appellant]" and to find "an out" for appellant. *Id.*

{¶ 118} Further, under the circumstances presented here, we cannot conclude that the trial court's investigation was improper. The trial court did not venture outside its own docket in making the comparison. "[A] trial court is not required to suffer from institutional amnesia. It is axiomatic that a trial court may take judicial notice of its own docket." *Indus. Risk Insurers v. Lorenz Equip. Co.*, 69 Ohio St.3d 576, 580, 635 N.E.2d 14 (1994). Appellant filed the motion expecting the trial court to review it.

{¶ 119} Appellant's citation to *J.S. v. L.S.*, 10th Dist. No. 19AP-400, 2020-Ohio-1135, 2020 WL 1488558 is unavailing. There, one of the parties in a CPO hearing submitted documents from cases in other counties. *Id.* at ¶ 9. After the trial court's staff attorney researched the cases online, the trial court concluded that the submitted documents were "fraudulent." *Id.* at ¶ 11. This court reversed, finding that the trial court gave the party no time to respond to the court's accusation of wrongdoing. *Id.* at ¶ 23.

{¶ 120} Here, the trial court considered a document previously filed by appellant in this case. The court gave both parties the opportunity to make a record in response to its finding that the handwriting in the letter matched the handwriting in the motion to dismiss. The court recessed for two hours to give defense counsel the opportunity to "see what they come up with." *Id.* at ¶ 79. However, the defense called no additional witnesses and offered no further arguments.

{¶ 121} In short, even if appellant had properly preserved the argument he now raises, he has failed to demonstrate bias; thus, there is no structural error and no automatic reversal. Appellant fails to show that it was plain error for the trial court to conduct the handwriting comparison. Moreover, appellant fails to demonstrate any reasonable probability of prejudice. The handwriting comparison essentially had no effect on the outcome of the Evid.R. 804(B)(6) hearing because it merely confirmed what the trial court had already concluded based on the contents of the letter, i.e., that appellant wrote the letter. Appellant provides no proof that at any point in the trial that the trial court exhibited hostility or ill will toward appellant that affected the guilty verdicts.

{¶ 122} The third assignment of error is overruled.

*Bias, supra.*

Ohio has a relevant procedural rule requiring contemporaneous objection to trial court error:  parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998).  In overruling Bias's Third Assignment of Error, the Tenth District enforced this rule, finding that Petitioner had failed to make a contemporaneous objection to having the same judge preside at the certification hearing and at trial and therefore the claim was to be reviewed only for plain error.  An Ohio state appellate court's review for plain error is enforcement, not waiver, of a procedural default.  *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle*, 271 F.3d 239 (6th Cir. 2001).

Moreover, Ohio's contemporaneous objection rule is an adequate and independent state ground of decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir.  2012), *citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011);

16

*Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir.), *cert. denied*, 562 U.S. 876 (2010).

Bias claims the procedural default is excused by ineffective assistance of trial counsel. Ineffective assistance can excuse a procedural default but only if that claim is first presented to and is successful in the state courts. *Edwards v. Carpenter*, 529 U.S. 446 (2000). A claim that counsel was ineffective for failing to object to the trial judge's participation in the certification procedure and then trying the case was presented to the Tenth District on direct appeal. That court rejected the claim on the prejudice prong of *Strickland v. Washington,* 466 U.S. 668 (1984), the controlling Supreme Court precedent. That decision was not an unreasonable application of *Strickland* because Bias's claim of judicial bias is misplaced. Briefly stated, the trial judge did not violate the Code of Judicial Conduct or commit any evidentiary impropriety by comparing the two pieces of handwriting in question.

Petitioner has not shown excusing cause and prejudice. Therefore merits review of his Fifth Ground for Relief is barred by his procedural default in presenting it to the state courts and it should be dismissed with prejudice.

**Ground Six: Denial of Right to Trial by Jury**

In his Sixth Ground for Relief, Bias argues Judge Holbrook deprived him of his right to

17

trial by jury by not advising him that the judge had presided over the Crim. Rule 16 certification hearing.

Bias raised this claim as his Fourth Assignment of Error on direct appeal and the Tenth District decided it as follows:

> {¶ 123} In his fourth assignment of error, appellant argues that the trial court's failure to disclose its participation in the certification hearing and its concomitant exposure to the information at that hearing regarding appellant's gang involvement prior to appellant's reaffirmance of his decision to waive jury invalidated his original jury waiver. Thus, argues appellant, his jury waiver was not made voluntarily, knowingly, and intelligently in violation of his constitutional right to trial by jury. Appellant maintains that the trial court's error amounts to reversible structural error. We disagree.

> {¶ 124} On February 17, 2021, the trial court held a hearing on appellant's expressed desire to waive his right to trial by jury. At that hearing, the court explained the waiver process and advised appellant of the consequences of proceeding to trial before the court rather than a jury. Appellant indicated he understood the court's explanation and admonitions and then executed the written waiver in open court. Thereafter, the court informed counsel that the Crim.R. 16(F) certification hearing would be set for April 12, 2021. Addressing appellant, the court described the certification hearing as "a technicality we've got to deal with that day." (Feb. 17, 2021 Tr. at 28.) Appellant's written jury waiver was filed the same day.

> {¶ 125} On the first day of trial, the prosecutor stated, "I know we already did a lengthy colloquy regarding his right to waive jury, and we've already gone on the record. I guess I would just ask again this morning that it's still his intention to waive jury and go forward with a bench trial." The trial court asked appellant, "Is that still your intention? Appellant responded, "Yes, sir." (Apr. 19, 2021 Tr. at 56.) No mention of the certification hearing and/or the information provided at that hearing was made by defense counsel, the prosecutor, or the trial court, nor did defense counsel object to the adequacy of the trial court's colloquy with appellant during the reaffirmation process.

> {¶ 126} Appellant does not dispute that the original jury waiver was both constitutionally and statutorily valid. Rather, appellant argues that the trial court's failure to advise him of the effect of the Crim.R. 16(F) hearing essentially invalidated the original waiver, and, as

such, he was never apprised of, and thus was deprived of, his constitutional right to trial by jury. The deprivation of a right to trial by jury has "consequences that are necessarily unquantifiable and indeterminate [and] unquestionably qualifies as a 'structural error.'" *Sullivan v. Louisiana,* 508 U.S. 275, 281-82, 113 S.Ct. 2078, 124 L.Ed.2d 182. However, assuming, without deciding, that an error in obtaining a jury waiver deprives an accused of the right to trial by jury, thus qualifying as structural error, appellant never requested that the trial court engage in any additional colloquy when he reaffirmed his jury waiver. As a result, appellant has forfeited all but plain error. *McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, at ¶ 66.

{¶ 127} Appellant has failed to demonstrate plain error. Appellant does not point us to any authority specifically holding that the trial court was required to advise appellant of its participation in the certification hearing prior to engaging in the additional colloquy about appellant's jury trial waiver. Furthermore, appellant fails to show prejudice. At the February 17, 2021, hearing, appellant was adamant in his decision to waive jury, even over defense counsel's advice to the contrary. There is no reasonable probability that an additional colloquy regarding the certification hearing would have caused appellant to withdraw his jury waiver or otherwise change the outcome of the trial.

{¶ 128} The fourth assignment of error is overruled.

*Bias, supra.*

As with the Third Assignment of Error, the Tenth District found Bias made no contemporaneous objection and reviewed only for plain error. For the reasons given above with Ground Five, this amounted to enforcement of a state procedural default repeatedly found independent and adequate by the Sixth Circuit.

Petitioner offers no excusing cause and prejudice other than citing his argument on the Fifth Ground, which the Court has rejected. His Sixth Ground for Relief should therefore be dismissed with prejudice.

**Ground Nine:  Improper Admission of Evidence**

In his Ninth Ground for Relief, Petitioner complains of three instances of admission of allegedly inadmissible evidence as part of his cumulative error claim.  As to two of those instances, the Tenth District held Bias had failed to object. *Bias, supra,* at ¶¶ 133, 141.  For the reasons given as to the Fifth Ground for Relief, that constitutes enforcement of an adequate and independent state procedural rule, the contemporaneous objection rule, and accordingly that portion of Ground Nine is procedurally defaulted.

In his Reply, Petitioner admits the failure to object, but asserts "plain error exists." (ECF No. 25, PageID 1874).  "Plain error" is not a doctrine that enables a habeas corpus petitioner to overcome a procedural default.  An Ohio appellate court's recognition of plain error will allow the state court to reach the merits of a claim, but in federal habeas a state court's reliance on the plain error doctrine is an enforcement rather than a waiver of a procedural default. *Wogenstahl, supra.* Because the failure to object is an independent and adequate state procedural rule which the Tenth District enforced and Bias has not overcome, this portion of his Ninth Ground for Relief should be dismissed as procedurally defaulted.


**Ground Ten:  Denial of a Right to a Speedy Trial**


In his Tenth Ground for Relief, Petitioner claims he was denied his constitutional right to a speedy trial in that the trial court, in denying his motion to dismiss on that basis, did not make adequate findings of fact under *Barker v. Wingo,* 407 U.S. 514, 530-32 (1972), the controlling Supreme Court authority on the constitutional right to a speedy trial.  The state appellate court found that Bias failed to request that the trial court make any additional findings. *Bias*, 2022-Ohio-4643, ¶151. Bias's failure to contemporaneously object is an adequate and independent state ground which

the state court relied on. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012).  Petitioner offers

no excusing cause and prejudice except to cite to the Fifth Ground for Relief.  His assertion there of

ineffective assistance of trial counsel has already been rejected.

The Tenth Ground for Relief should be dismissed as procedurally defaulted.

**Merits Review**

### Grounds One:  Violation of the Confrontation Clause

In his First Ground for Relief, Petitioner asserts his rights under the Confrontation Clause

"and/or Fed. R. Evid. 804" were violated when the prosecutor did not make a sufficient good faith

effort to obtain the live testimony of witness Jaw.L.

Fed.  R. Evid.  804 does not apply in state criminal proceedings.  Fed.  R. Evid.  101(a) provides

"These rules apply to proceedings in United States courts."  The Congress of the United States, which

adopted the Federal Rules of Evidence, does not have authority to govern evidence in state courts and

did not attempt to in these Rules.

Ohio, however, has a rule of evidence which parallels Fed.  R. Evid.  804.  While Ohio law

generally requires the exclusion of hearsay, Ohio R. Evid. 804(b)(6) provides an exception for a

statement of an unavailable witness whose unavailability is caused by the party against whom the

statement is offered.

> **(6) Forfeiture by wrongdoing.** A statement offered against a party
> if the unavailability of the witness is due to the wrongdoing of the
> party for the purpose of preventing the witness from attending or
> testifying. However, a statement is not admissible under this rule
> unless the proponent has given to each adverse party advance
> written notice of an intention to introduce the statement sufficient to
> provide the adverse party a fair opportunity to contest the
> admissibility of the statement.

Petitioner argued these two claims as part of his Second Assignment of Error on direct appeal and the Tenth District decided the claims as follows:

{¶ 56} In his second assignment of error, appellant contends that the trial court erred in admitting the video recordings of Jaw.L.'s statements to the police. More particularly, appellant maintains the statements were not admissible under Evid.R. 804(B)(6) and that such evidence violated his Sixth Amendment right to confront the witnesses against him. Appellant also claims that the trial court erred in overruling his motion to suppress Jaw.L.'s photo array identification. We disagree.

{¶ 57} We first address appellant's contentions pertaining to the admission of the video recordings of Jaw.L.'s statements to the police. Initially, we note that "'[b]ecause testimony may be admissible under the Confrontation Clause yet inadmissible under the rules of evidence, and vice versa, the declarant's statements must fall within the constitutional requirements *and* the rules of evidence to be admissible.'" (Emphasis sic.) *State v. Miller*, 9th Dist. No. 14CA010556, 2016-Ohio-4993, 2016 WL 3881187, ¶ 11, quoting *State v. Nevins*, 171 Ohio App.3d 97, 2007-Ohio-1511, 869 N.E.2d 719, ¶ 36 (2d Dist.) As a result, we consider appellant's evidentiary and constitutional challenges to the admission of Jaw.L.'s statements separately. *See State v. Hand,*107 Ohio St. 3d 378, 2006-Ohio-18, 840 N.E. 2d 151 (considering first whether challenged out-of-court statements were admissible under Evid.R. 804(B)(6) and second whether their introduction was consistent with the Confrontation Clause).

{¶ 58} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay statements are inadmissible except as otherwise provided in the Ohio Rules of Evidence or other relevant constitutional *661 or statutory provisions. Evid.R. 802. Here, the trial court allowed Jaw.L.'s hearsay statements to be offered against appellant pursuant to the forfeiture by wrongdoing exception set forth in Evid.R. 804(B)(6). That rule provides in part:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

**Forfeiture by wrongdoing.** A statement offered against a party if the unavailability of the witness is due to the

wrongdoing of the party for the purpose of preventing the witness from attending or testifying.

(Emphasis sic.)

{¶ 59} Forfeiture by wrongdoing is an equitable exception to a defendant's constitutional right to confront the witnesses against him. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 96, citing *Giles v. California*, 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). The doctrine is codified in Evid.R. 804(B)(6), which permits the prosecution to use hearsay statements of an unavailable witness if the prosecution can show by a preponderance of the evidence that "(1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify." *McKelton* at ¶ 96, citing *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 106, and *Hand* at ¶ 84. The prosecution need not establish that the defendant's sole purpose was to prevent the witness from testifying; it need only show that the defendant's wrongdoing which caused the witness's unavailability "was motivated in part by a desire to silence the witness." *Hand* at ¶ 84, 90.

{¶ 60} Although a trial court's hearsay rulings are generally reviewed for an abuse of discretion, "we review de novo evidentiary rulings that implicate the Confrontation Clause." *McKelton* at ¶ 97, citing *United States v. Henderson,* 626 F.3d 326, 333 (6th Cir. 2010).

{¶ 61} At the prosecutor's request, the trial court conducted an Evid.R. 804(B)(6) hearing relative to Jaw.L.'s unavailability to testify at trial. At the outset of that hearing, the court averred that "[n]one of this will be used to impeach the defendant or anything else like that. This is strictly for the purposes of determining availability and the causation. At least that's how I understand it." (Apr. 21, 2021 Mot. Hearing Tr. at 4.) In addition, the court stated,

> "I just wanted to make sure that the defendant understood that the purpose of this [hearing] is to determine this initial question. * * * [I]t's not necessarily attacking his character or anything. * * * It's whether or not you have sufficient reasons to permit me to exercise the exception [to the hearsay rule]."

*Id.* at 5.

{¶ 62} Prior to calling his first witness, the prosecutor proffered for the record the events that led to the filing of the request for an Evid.R. 804(B)(6) hearing. To that end, the prosecutor recounted that on the first day of trial, he received information that Jaw.L. had received death threats related to his impending testimony; the trial court gave the prosecutor time to place Jaw.L. in protective custody. The prosecutor further related that he told defense counsel that Jaw.L. was cooperative and ready to testify, but he did not want defense counsel to share that information with appellant due to concerns for Jaw.L.'s safety.

{¶ 63} Following this proffer, the trial court, addressing defense counsel, stated: "I want to make one thing clear. * * * Normally if we were in a jury trial, I would have the jury exit and we would do this hearing. Since I'm both trier of fact and judge, I can separate the two. So this is like a mini hearing inside of a trial, and I wanted to make sure your client understood that * * * [i]t's not going to be judged in his case in chief." (Mot. Hearing Tr. at 8-9.) Defense counsel averred that he had informed appellant that the evidence presented at the hearing would not be used by the court in determining his guilt or innocence. The court reiterated that the evidence "[is] not being used on the score card * * * on the trial. It's strictly to deal with evidentiary issues." *Id.* at 9.

{¶ 64} Following this preliminary discussion, the prosecutor presented the following evidence.

{¶ 65} Shelley Hughes testified that she was Jaw.L.'s former juvenile probation officer. As such, she was well-acquainted with Jaw.L. and remained in contact with him after he was released from probation. At the prosecutor's request, Hughes contacted Jaw.L and urged him to cooperate with the prosecution's investigation into the shootings. Jaw.L. met with prosecutors and provided his version of the events of December 4, 2017. The case was eventually set for trial on April 19, 2021. On March 4, 2021, prosecutors again met with Jaw.L.; at his request, Hughes sat in on the meeting. Prosecutors told Jaw.L. that a subpoena would issue compelling his testimony at trial and that failure to comply with the subpoena would result in the issuance of a warrant for his arrest. According to Hughes, Jaw.L. understood the consequences of his failure to honor the subpoena and was cooperative and willing to testify.

{¶ 66} On April 4, 2021, Hughes informed prosecutors that Jaw.L. told her he had received some "indirect threats" through social media. *Id.* at 14. At the request of prosecutors, Hughes met with Jaw.L. in person on April 16, 2021. During a three-way telephone

conversation between Hughes, Jaw.L., and prosecutors, Jaw.L. asserted that he would testify at trial. Hughes and the prosecutors assured Jaw.L. that they would not tell anyone about the meeting. According to Hughes, during the meeting, Jaw.L. was "very relaxed * * * willing to cooperate * * * [and] 100 percent in agreement with [testifying]." *Id.* at 15.

{¶ 67} Thereafter, on April 19, 2021, the day trial commenced, Hughes received a text message from Jaw.L. stating, "[t]hings are real bad." *Id.* Hughes immediately called Jaw.L., who reported that he had received "death threats" via text messages and a telephone call from an unknown private number. *Id.* at 15-16. Jaw.L. told Hughes that the caller warned that "if he testified, he would be dead by Friday." *Id.* at 16. According to Hughes, Jaw.L. was "very upset, very nervous," and told Hughes he was not going to testify. *Id.* at 15. Perceiving the threats to be genuine, Hughes immediately contacted prosecutors and reported what Jaw.L. had told her.

{¶ 68} Soon thereafter, Hughes contacted Jaw.L. to check on his well-being. He told Hughes he had received a letter via text message and that "they knew everything," including that he had met with prosecutors and Hughes. *Id.* at 17. He further averred that the letter contained information only appellant would know. Jaw.L. further reported that he was being followed and that "they" knew where he lived and what he had for dinner the previous evening. *Id.* According to Hughes, Jaw.L. was "extremely worried" and told Hughes he did not want to testify. *Id.* at 17-18. Thereafter, prosecutors and Hughes made "significant efforts" to persuade Jaw.L. to testify. *Id.* at 18. Hughes opined that but for the letter and the telephone call, Jaw.L. would have testified.

{¶ 69} On cross-examination, Hughes averred that Jaw.L. was served with a subpoena at the March 4, 2021 meeting. She acknowledged that Jaw.L. did not tell her on what social media platform the anonymous threats were posted, that he had never sent her screenshots of the text messages or forwarded them to her, and that she had never viewed Jaw.L.'s phone. She further acknowledged that she did not know whether Jaw.L. had told anyone else about his meeting with her and the prosecutors.

{¶ 70} Detective Robert C. Vass testified that he was assigned to the CIU for approximately eight and one-half years prior to his current assignment as a SWAT officer. Vass provided general testimony about both CIU and SWAT involvement in assessing the validity and credibility of threats made to cooperating witnesses and placement of those witnesses in protective custody if necessary.

Vass also testified generally that incarcerated gang members are often able to communicate with unincarcerated gang members.

{¶ 71} Specific to this case, Vass testified that he became familiar with the Deuce Deuce Bloods when he worked in CIU and in that capacity had testified as an expert regarding their criminal gang activity. He remains in contact with gang members in his capacity as a SWAT officer executing both search warrants and arrest warrants. Vass described the Deuce Deuce Bloods as a "violent gang." *Id.* at 26. On April 19, 2021, Vass was asked to conduct a threat assessment regarding an individual who was scheduled to testify in a homicide case involving the Deuce Deuce Bloods. Vass interviewed the individual, later identified as Jaw.L., at an undisclosed location on the afternoon of April 19, 2021. During that interview, Jaw.L. stated that he had received an anonymous telephone call that morning; the caller warned him not to testify, stating specifically that he "wouldn't make it until the end of the week" if he did so. *Id.* at 33. Jaw.L. also showed Vass a screenshot of a handwritten letter he had received via text message on his phone. (State's Ex. Z-1.) Vass averred that he later met with the prosecutor and Jaw.L. at an undisclosed location to discuss the contents of the letter. Because the letter was difficult to read on Jaw.L.'s phone, Vass had the letter transcribed. (State's Ex. Z-2.) Vass read the transcribed version of the letter into the record. It states in its entirety:

> Babe, I just started my hole time. * * * I miss you so much. I'm in here going through it. I don't know what's about to happen. My lawyers just came down here and they said some BS. I'm really about to go on the 19th though, but they said that [Jaw.L.] met with the prosecutor and his PO and said he is coming. At least that's what the prosecutor told my lawyer. He told them that it's a lot of pressure about him coming to court.

> He said like three different names in an interview and never once said mine until they got him alone, and they covered up that statement. They said they will let me see it next week. They still said don't worry about Black [Vinson] though.

> Baby, I need you to hop on some 'you want your [N word] home' type shit. I know you do, but I need you to get super aggressive with all my brothers, and like as soon as you get this letter, AND DON'T LET UP!![10] They not going to get mad at you. And if they do * * *.

You want your [N word] here, period. Call Dog, Wop, and Nut Box and then tell them you got to do something about this little [N word]. And don't call like I'm telling you to call; call like you want your [N word] home. Use your own words and blow down on them [N word]. Let them know you mad they ain't doing nothing. They ain't got no choice but to respect it.

Tell Dog and Wop who Nut Box is * * * and tell them he can get to the [N word] easy, and tell them it can't be no violence. Tell them a bad pill or a nap * * * until it's over, and then let him go. Tell them Nut Box can put it together.

Please don't let this slip your mind, momma. This is my last chance. Call Nut Box and tell him what the [N word] said to the prosecutor, but tell him don't say nothing to the [N word], just keep him close.

If you get that money you was supposed to get, tell Nut you like got three racks to make sure dude pop a pill or something. And if he with it, let Dog know to tell them to put something together, or you can get one of them girls you be with to pull up on Nut to make sure.

*Id.* at 36-38; State's Ex. Z-2.

{¶ 72} Vass interpreted several of the phrases contained in the letter. For example, Vass stated that the phrase "hole time" meant "a location inside the jail," and that "nap" meant "kidnap." *Id.* at 36, 37. Vass construed the phrase "super aggressive with all my brothers" to mean "don't wait. Get the crew [meaning other gang members] together and * * * go find this kid." *Id.* at 39-40. Vass translated the phrases "don't let up" and "be aggressive" to mean "you've * * * got to do it now. I'm running out of time. It's got to be done right away." *Id.* at 40. According to Vass, the reference to getting "one of them girls * * * to pull up" meant that "females * * * can get closer to the guys, make them relax, get them to drop their guard and get them intoxicated; and then the gang members will come in and commit the crime." *Id.* at 44. The reference to "a bad pill or a nap until it's over" meant that someone would give the target a drug like ecstasy to make the target incoherent so that the target could be moved from one location to another until the legal proceedings were completed. *Id.* at 43. Vass translated the reference to "three racks" as meaning that $3,000 would be paid to complete the kidnapping; according to Vass, 1 "rack" equals $1,000. *Id.*

27

{¶ 73} Vass averred that Jaw.L. took the threats very seriously and was "terrified" that he was going to be killed by the end of the week if he testified. *Id.* at 44. According to Vass, Jaw.L.'s main concern was that since he could not identify the person or persons responsible for the threats, he was afraid the person or persons would be able to get close to him without him knowing he was in danger.

{¶ 74} Vass stated that he and other officers spent over two hours on April 19, 2021 urging Jaw.L. to testify, but he continually refused to do so. Indeed, according to Vass, "[Jaw.L.] got to the point where he was like, "[j]ust throw me in jail if you have to, but I'm not testifying." *Id.* at 45. When Vass left that evening, Jaw.L. remained uncooperative and refused to testify.

{¶ 75} The next day, April 20, 2021, Vass and other officers again contacted Jaw.L. and urged him to testify. Vass explained all available options for ensuring Jaw.L.'s safety, including placing him in protective custody, moving him to another location, and providing him financial assistance. Jaw.L. steadfastly refused to testify, stating he just needed to "move on" and "get away from all of this." *Id.* at 46. The next day, April 21, 2021, Vass sent Jaw.L. a text message at approximately 6:00 a.m.; Jaw.L. responded that he was planning to leave protective custody. Shortly thereafter, Vass learned that Jaw.L. had left protective custody and refused further assistance from CDP.

{¶ 76} On cross-examination, Vass averred that he had not taken screenshots of Jaw.L.'s phone and did not have Jaw.L. show him the alleged social media threats on his phone. According to Vass, the only thing he saw on Jaw.L.'s phone was the hand-written letter.

{¶ 77} The parties stipulated to State's Ex. Z-3, an April 2, 2021 entry from the Franklin County jail establishing that appellant was in "lockdown" at the jail from March 30 to April 9, 2021.

{¶ 78} Following presentation of the evidence and arguments by counsel, the trial court issued an oral decision granting the prosecutor's Evid.R. 804(B)(6) motion. The trial court began its analysis by stating that it had compared the handwriting in a pro se motion to dismiss appellant previously filed in the case to the handwriting in the letter Jaw.L. received via text message. The court concluded that the handwriting "appears to be the same." (Mot. Hearing Tr. at 74.) The court averred that the motion to dismiss was a matter of court record and that "it's one of those things that as a

trier of fact I can make the comparison, even though it wasn't proffered by you all." *Id.*

{¶ 79} The court then permitted argument on the matter. To that end, defense counsel asserted that the motion to dismiss could not be considered because it was extrinsic evidence. The court responded, "[i]t's part of the Court record, so it's not extrinsic." *Id.* Next, defense counsel argued that the motion had not been marked as an exhibit for purposes of appeal. The court countered that the motion had been marked as "Court Exhibit Alpha." *Id.* Defense counsel then contended that any handwriting analysis required expert testimony. The trial court asserted that case law established that "the trier of fact can make that comparison on handwriting," and that "experts only testify what to look for, and unfortunately I've probably heard about 50 of these." *Id.* The court further stated that appellant "has very distinctive D's * * * [and] E's and lower casings * * * and they seem to compare." *Id.*

{¶ 80} The trial court averred that it made the comparison to benefit and protect appellant:

> I [made the comparison] more in an interest of protecting [appellant]. Because as it stood right now, indications factually were that that letter was from him. How he got it is secondary. Okay?
>
> He got it in a text. So I was just verifying, trying to protect your client to try to find an out for him, and unfortunately it looked like it's the same handwriting.
>
> And since it was a motion, I think I can consider that evidence, because it's not part of the factual trial.
>
> In all candor, I was doing it for the benefit of [appellant] just to make sure. Because factually, there were things related in that letter that only he would know. And * * * I also had the concerns of him discussing your conversations.

*Id.* at 76.

{¶ 81} The court assured defense counsel that "none of this is being considered for the trial aspect of it. * * * This has nothing to do with the credibility of what that witness was." *Id.*

{¶ 82} The court then reiterated its justification for conducting the handwriting comparison:

> [I]t is part of the public record. It was on [appellant's] own volition that he submitted the sample. Okay?
>
> And, yeah, it wasn't presented by the State, but, you know, this is a hearing and the State has their burden met. Okay? I was just seeing an independent veracity of the letter. That's what I was after. So it was actually for the benefit of your client. Unfortunately, it didn't work out that way.

*Id.* at 77.

{¶ 83} Following this discussion, the court granted the prosecution's motion and permitted the admission of Jaw.L.'s videotaped police interviews (State's Exs. Y-1 and Y-2) and the audiotaped photo array procedure. (State's Ex. Y-3.)

{¶ 84} Appellant's hearsay-based argument is two-fold. First, appellant contends that it was receipt of the threatening telephone calls and text messages from unknown individuals, and not receipt of the letter, that prompted Jaw.L.'s decision not to testify. Appellant notes Hughes's testimony that Jaw.L. told her he could not identify the threatening caller and the admissions by both Hughes and Vass that they did not preserve screenshots of the text messages. Appellant maintains that because the threatening calls and text messages could not be traced to appellant, the prosecution failed to establish that he engaged in wrongdoing that resulted in Jaw.L.'s unavailability to testify at trial. Appellant further contends that even assuming he authored the letter, he instructed the recipient to tell the putative kidnappers (Dog, Wop, and Nut Box) not to use violence; thus, any violence by the putative kidnappers was not authorized and thus could not be imputed to him. We reject appellant's argument on both points.

{¶ 85} It is clear from the trial court's statements that it granted the Evid.R. 804(B)(6) motion based upon the letter and not the threatening phone calls or text messages. Indeed, the trial court averred that it had examined the letter and compared the handwriting therein to appellant's hand-written pro se motion to dismiss filed earlier in the proceedings. The trial court went to great lengths to explain its reasoning for making the handwriting comparison. The trial court did not mention the threatening phone calls or text messages in its analysis.

{¶ 86} Further, we find no merit to appellant's argument that the letter did not prove that he engaged in wrongdoing that resulted in Jaw.L.'s unavailability because the letter did not authorize violence against Jaw.L. Although the letter references "no violence," the letter urges the recipient to engage Dog, Wop, and Nut Box in a plot to kidnap Jaw.L. and hold him until the trial concluded. As pointed out by the state in its briefing, kidnapping is an offense of violence. R.C. 2905.01(A); 2901.01(A)(9)(a). Further, Evid.R. 804(B)(6) "covers a variety of wrongdoing beyond the murder or physical assault of the declarant." *State v. Harper,* 6th Dist., 2017-Ohio-1395, 89 N.E.3d 141, ¶ 31. *See also State v. Miller,* 9th Dist. No. 14CA010556, 2016-Ohio-4993, 2016 WL 3881187, ¶ 15 ("a review of the staff notes to Evid.R. 804(B)(6) as well as Ohio case law reveals that the rule is intended to cover more situations than simply those that implicate the murder or serious assault of the declarant. The 2001 Staff Note to Evid.R. 804(B)(6) states that 'the wrongdoing need not consist of a criminal act.' "). In light of this authority, we reject appellant's argument that evidence of a kidnapping plot, even one without "violence," is insufficient to support the trial court's finding that he engaged in wrongdoing for the purpose of making a witness unavailable for trial.

{¶ 87} Appellant also argues that the prosecution failed to establish Jaw.L.'s unavailability to testify. "Unavailability" is defined, as pertinent here, as including situations in which the declarant "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." Evid.R. 804(A)(5).

{¶ 88} The burden is on the proponent of the evidence to establish unavailability, and, in the criminal setting, a witness is only considered unavailable if the prosecution has made reasonable, good-faith efforts to secure his or her presence at trial. *State v. Keairns,* 9 Ohio St.3d 228, 230, 460 N.E.2d 245 (1984), citing *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The measures the prosecution must undertake in order to fulfill its burden of reasonableness and good faith depend on the facts and circumstances of each case. *State v. Tabor*, 12th Dist. No. CA2011-07-076, 2012-Ohio-4642, 2012 WL 4761741, ¶ 14.

{¶ 89} Appellant acknowledges Hughes's testimony that the prosecution served Jaw.L. with a subpoena to compel his testimony. However, citing *Kearns,* appellant argues that "the issuance of a subpoena alone does not constitute a sufficient effort when other reasonable methods are also available." (Appellant's Am. Brief at 21.)

{¶ 90} We first note that appellant's reliance on *Keairns* for its subpoena-only argument is unavailing. There, the prosecution offered no sworn testimony of its efforts to locate the witness. The sole support offered consisted of representations of the prosecutor that subpoenas had been issued and that he had asked the sheriff to make a continued search for the witness. The court stated that "[a] showing of unavailability under Evid.R. 804 must be based on testimony of witnesses rather than hearsay not under oath unless unavailability is conceded by the party against whom the statement is being offered." *Keairns* at 232, 460 N.E.2d 245. The court found that the prosecutor's representations had not met that requirement. The court further found that the prosecutor's "continued search" statement lacked sufficient particularity to allow the court to determine what steps had been taken and whether they were reasonable. *Id.* The court ultimately found that "the issuance of a subpoena alone does not constitute a sufficient effort when other reasonable means are also available." *Id.*

{¶ 91} Here, in contrast to *Keairns,* the prosecution presented sworn testimony about its efforts to secure Jaw.L.'s trial testimony both via subpoena and via methods beyond issuance of the subpoena. As noted above, Hughes testified that at the April 19, 2021 meeting "significant efforts" were made to encourage Jaw.L. to testify. Vass testified that on April 19, 2021, he and other police officers pressed Jaw.L. for over two hours to testify, but he repeatedly refused to do so. According to Vass, Jaw.L. ultimately told the officers that they could "throw him in jail," but he still would not testify. The next day, April 20, 2021, Vass again attempted to secure Jaw.L.'s testimony. Vass explained all available options for ensuring Jaw.L.'s safety, including placing him in protective custody, relocating him, and providing him financial assistance, but Jaw.L. adamantly refused to testify. The next morning, April 21, 2021, Vass contacted appellant and again urged him to testify. As did the defendant in *State v. Parker*, 6th Dist. No. L-18-1238, 2020-Ohio-4607, 2020 WL 5743300, ¶ 94, Jaw.L. made it clear that he "did not want to be involved with the case, did not intend to cooperate with the prosecution of the case, and would not come to court." *Id.* The only additional effort suggested by defense counsel at the hearing was to issue an arrest warrant, bring Jaw.L. into court, and hold him in contempt *668 if he refused to testify. However, as we have already noted, such effort would have proven futile, as Jaw.L. told Vass he would not testify even if he were taken to jail.

{¶ 92} As noted above, the test for unavailability is whether the state made reasonable, good-faith efforts to secure the witness's

appearance. The test is not whether the state took every conceivable step possible. "[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence * * * but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Hardy v. Cross*, 565 U.S. 65, 71-72, 132 S.Ct. 490, 181 L.Ed.2d 468 (2011).

{¶ 93} After hearing the evidence, the trial court concluded that the prosecution proved both prongs of the Evid.R. 804(B)(6) test. We discern no basis in the record to conclude that the trial court erred in determining that the prosecution demonstrated by a preponderance of the evidence that appellant engaged in wrongdoing for the purpose of preventing Jaw.L. from testifying at trial and that it made reasonable, good-faith efforts to secure Jaw.L.'s presence at trial. As a result, we conclude that the trial court properly admitted Jaw.L.'s out-of-court statements to the police under Evid.R. 804(B)(6).

{¶ 94} Turning to appellant's constitutional argument, we note that the Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to confront the witnesses against him. This protection "'requires, wherever possible, testimony and cross-examination to occur at trial.' " *Harper*, 6th Dist., 2017-Ohio-1395, 89 N.E.3d 141, at ¶ 33, quoting *State v. Myers*, 9th Dist. No. 25737, 2012-Ohio-1820, 2012 WL 1419104, ¶ 21. However, the right to confront one's accuser "is not absolute and 'does not necessarily prohibit the admission of hearsay statements against a criminal defendant.' " *State v. Madrigal*, 87 Ohio St.3d 378, 385, 721 N.E.2d 52 (2000), quoting *Idaho v. Wright*, 497 U.S. 805, 813, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Indeed, courts have "explicitly preserved the principle that an accused has forfeited his confrontation right when the accused's own misconduct is responsible for a witness's unavailability." *Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 105, citing *Crawford v. Washington,* 541 U.S. 36, 62, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("The rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be alternative means of determining reliability."). The *Hand* court also cited *Reynolds v. United States,* 98 U.S. 145, 158, 25 L.Ed. 244 (1878) (stating that if the witness is unavailable due to the defendant's own misconduct, the defendant "is in no condition to assert that his constitutional rights have been violated").

{¶ 95} Here, the trial court determined that Jaw.L.'s out-of-court statements to the police were admissible upon a finding that

> appellant, through the letter, threatened to kidnap Jaw.L. for the purpose of making him unavailable to testify at trial. As discussed above, we have determined that the trial court did not err in making that finding. As a result, we conclude that appellant forfeited his confrontation right by engaging in this wrongdoing and that the trial court did not err by admitting Jaw.L.'s out-of-court statements into evidence.

*Bias, supra*.

In its decision the Tenth District distinguished Petitioner's claims under Ohio R. Evid. 804(6) and the Confrontation Clause.  This Court cannot review the merits of the Evidence Rule decision because that is a matter of state law on which we are bound by the Tenth District's conclusion.  *Thomas v. Stephenson*, 898 F.3d 693, 700 n.1 (6th Cir. 2018); *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008), *quoting Bradshaw v. Richey,* 546 U.S. 74, 76 (2005)("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.")*, Maldonado v. Wilson*, 416 F.3d 470 (6th Cir. 2005)*; Vroman v. Brigano*, 346 F.3d 598 (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 735-36 (6th Cir. 1999); *Duffel v. Dutton,* 785 F.2d 131, 133 (6th Cir. 1986).

In contrast, we are not bound by the Tenth District's constitutional analysis.  However, when a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).  Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Petitioner begins his argument on the Confrontation Clause by asserting the Tenth District misapplied *Ohio v. Roberts*, 448 U.S. 56 (1980)(Reply, ECF No. 25, PageID 1826, et seq.). The holding in question is

> {¶ 88} The burden is on the proponent of the evidence to establish unavailability, and, in the criminal setting, a witness is only considered unavailable if the prosecution has made reasonable, good-faith efforts to secure his or her presence at trial. *State v. Keairns*, 9 Ohio St.3d 228, 230, 460 N.E.2d 245 (1984), citing *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The measures the prosecution must undertake in order to fulfill its burden of reasonableness and good faith depend on the facts and circumstances of each case. *State v. Tabor*, 12th Dist. No. CA2011-07-076, 2012-Ohio-4642, 2012 WL 4761741, ¶ 14.

*Bias, supra*.

In *Roberts* the Supreme Court held that the preliminary hearing testimony who was cross-examined in that proceeding could be admitted at trial if the witness was unavailable at the time of trial. *Roberts* has been overruled on this point by *Crawford v. Washington*, 541 U.S. 36 (2004). But *Roberts* also discusses unavailability for Confrontation Clause purposes:

> The basic litmus of Sixth Amendment unavailability is established: "[A] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." *Barber v. Page*, 390 U.S., at 724–725, 88 S.Ct., at 1322 (emphasis added). *Accord, Mancusi v. Stubbs, supra; California v. Green*, 399 U.S., at 161–162, 165, 167, n. 16, 90 S.Ct., at 1936–1937, 1938–1939, n. 16; *Berger v. California*, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969).
>
> Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths

35

> to which the prosecution must go to produce a witness . . . is a question of reasonableness." *California v. Green*, 399 U.S., at 189, n. 22, 90 S.Ct., at 1951 (concurring opinion, citing *Barber v. Page, supra* ). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.

448 U.S. at 74-75.

The Tenth District's opinion discusses the efforts which the State made to obtain Jaw.L.'s testimony in addition to issuing and serving a subpoena for his appearance: repeated conversations with involved police officers, involvement of Jaw.L.'s probation officer, assurances of police protection, etc. Petitioner suggests there were other things that could have been done: arresting Jaw.L. on a material witness warrant, forcing him to refuse to testify in court, imprisoning him for contempt if he refused, etc..

Petitioner relies on *Jennings v. Maynard*, 946 F.2d 1502 (10th Cir. 1991). In that case a witness had given incriminating information about the defendant to law enforcement, then refused to testify at a preliminary hearing, invoking his Fifth Amendment privilege. The Tenth Circuit held the refusal, made in the face of threats from the defendant, was sufficient to show unavailability under the Confrontation Clause, even in the absence of a court order to testify.

Petitioner claims *Jennings* is binding on this Court and shows the trial court in his case should have made Jaw.L. refuse to testify in open court. The Magistrate Judge disagrees. First of all, as a Tenth Circuit case, *Jennings* is not binding on this Court; only published Sixth Circuit precedent is binding. Second, to achieve habeas corpus success, Petitioner must show an unreasonable application of Supreme Court, not circuit court, precedent. Third and most important, Petitioner's argument relies on a logical fallacy: the fact that open court refusal to testify was found **sufficient** in *Jennings* does not imply that it was **necessary**.

36

What Petitioner must show is that the Tenth District's decision is an unreasonable application of *Roberts*. It is not. *Roberts* requires reasonable good faith effort to obtain the witness's testimony. The Tenth District made findings of fact about what efforts were made and Petitioner does not deny that those effort occurred. The Tenth District then concluded that the efforts made were sufficient under the circumstances to satisfy the Confrontation Clause. That combined finding of fact and conclusion of law is entitled to deference under both subsection of 28 U.S.C. § 2254(d).

Petitioner relies on a number of other Ohio cases on unavailability (Reply, ECF No. 25, PageID 1830-32). The standard adopted by the Supreme Court in *Roberts* is stated in general terms, allowing a number of applications, even if apparently contradictory to one another, to be reasonable.

A troubling comparison with the state court cases is found at PageID 1832 where Petitioner argues that the three defendants in the state cases he cited were "white Americans" whereas he is an African American. He claims this was the decisive factor in his case, leading him to conclude he has suffered a miscarriage of justice. *Id.* The opinions in *Jennings, Artis,* and *Smith* do not identify the ethnicity of the defendants. How does Petitioner know they were white? How would the Ohio Tenth District Court of Appeals know the ethnicity of a habeas petitioner in the federal Tenth Circuit Court of Appeals? Bias is apparently willing to accuse the Ohio courts of racism on assumed facts.

**Ground Two:  Violation of the Confrontation Clause**

In his Second Ground for Relief Petitioner asserts the Confrontation Clause "and/or Fed. Evid. R 804" require a prosecutor to demonstrate that a defendant directed a third-party to threaten a witness

before the third-party's conduct may be imputed to the defendant for purposes of admitting the witness's unconfronted testimonial statements against him pursuant to the forfeiture-by-wrongdoing exception.

As noted above, this habeas court cannot review the Tenth District's application of Ohio evidence law.  Our jurisdiction is confined to alleged violation of the United States Constitution.

In this case it is not some third-party's conduct which was imputed to Bias to show wrongdoing, but rather imputation to Bias of giving very specific instructions to a woman he trusted on how to have Jaw.L. kidnapped to prevent him from testifying.  Jaw.L. saw the letter on his cell phone before the trial began and the trial judge decided the letter was the cause of his refusal to testify. Circumstantial evidence supports the imputation of authorship to Bias:  he had motive, means, and opportunity to write the letter and indeed does not deny authorship.  Other circumstantial evidence relied on by the trial judge was a handwriting comparison of a document known to have been written by Bias and filed with the trial court with the handwriting in the letter.  Petitioner cavils at the evidentiary quality of the evidence – e.g., the "original" of the letter was not offered in evidence.  But he cites no United States Supreme Court precedent requiring proof of that quality.  Certainly the seriousness of the threat – kidnapping and holding for the trial's duration – is sufficiently serious to constitute wrongdoing under the Confrontation Clause.  The Tenth District's decision was a reasonable application of *Giles v. California,* 554 U.S. 353 (2008), because Petitiomner's purpose in planning the kidnapping was stated to be keeping Jaw.L. from testifying.

Petitioner's Second Ground for Relief should be denied on the merits.


**Ground Three:  Admission of Identification Resulting from Suggestive Circumstances**

In his Fourth Ground for Relief, Petitioner argues his pre-trial identification by Jaw.L. resulted from an unnecessarily suggestive procedure in violation of his Due Process rights.

Petitioner made this argument as part of his Second Assignment of Error on appeal and the Tenth District decided it as follows:

> {¶ 97} Appellant contends that Jaw.L.'s pre-trial identification derived from an unnecessarily suggestive photo array procedure. Courts have adopted a two-prong test to determine the admissibility of pre-trial identification testimony. *Glenn-Coulverson*, 10th Dist., 2017-Ohio-2671, 90 N.E.3d 243, at ¶ 52. First, there must be a determination that the identification procedure was so impermissibly suggestive as to give right to a substantial likelihood of misidentification. *Id.*, citing *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 38 (10th Dist.), citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Second, there must be a determination that the identification itself was unreliable under the totality of the circumstances. *Id.*, citing *Monford* at ¶ 38. If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.*, citing *State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, 2010 WL 3292966, ¶ 31. A pretrial identification may be suppressed only if it is both unnecessarily suggestive and unreliable under the totality of the circumstances. *Monford* at ¶ 40.

> {¶ 98} Appellant fails to show that the photo array procedure was unduly suggestive. CDP used a blind administrator in compliance with R.C. 2933.83. Such measure generally ensures compliance with due process. *State v. Howard*, 8th Dist. No. 100094, 2014-Ohio-2176, 2014 WL 2167980, ¶ 33. The administrator advised Jaw.L. that he was not required to select any photograph and that the subject of the investigation may or may not be included in the photographs. (State's Ex. Y-3.)

> {¶ 99} Noting Jaw.L.'s initial statement that "photographs 1, 2, 4, and 6 looked familiar," appellant points to the administrator's statements that "you're referencing number 6 there, can you say that is, is not, or you aren't sure" and "I don't want to put words in your mouth but, are you able to answer with any of those three?" as "improperly steer[ing] [Jaw.L.] into selecting [appellant's] photograph." (Appellant's Am. Brief at 26.) We disagree. The administrator did not know that the person depicted in photograph number 6 was the suspect. Further, the question by its own terms does not impermissibly suggest that photograph number 6 was the suspect. Indeed, two of the three options offered by the

administrator, i.e., "is not" or "not sure" would have led to a non-identification of number 6.

{¶ 100} Even assuming the administrator's question was impermissibly suggestive, suppression of the identification would still be improper because Jaw.L.'s identification was reliable. We have already addressed and rejected appellant's identical arguments regarding the reliability of the identification in our disposition of the first assignment of error.

*Bias, supra.*

The Tenth District identified the controlling Supreme Court precedent, in *Neil v. Biggers*, 409 U.S. 188 (1972). To prevail, Bias must show that that the Tenth District's decision was an unreasonable application of *Neil*. To do so, Bias quotes the controlling factors from *Neil* and then quarrels with the Tenth District's findings of fact as to each of them. To overcome a state court finding of fact, a habeas petitioner must rebut the presumption of correctness which attaches to those findings by clear and convincing evidence. 28 U.S.C. § 2254(e).

Most importantly, the Tenth District found the Columbus Police Department had used a "blind" administrator – a person who did not know the identity of the suspect – to administer the photo array process. The Ohio General Assembly imposed the blind administrator requirement in Ohio Revised Code § 2933.83 in 2010 as an important reform to avoid wrongful convictions. The appellate court in this case held compliance with the statute satisfied the constitutional requirement to avoid unduly suggestive identification procedures, *Bias, supra,* at ¶ 98, citing *State v. Howard*, 2014 -Ohio- 2176 (Ohio App. 8th Dist. May 22, 2014).

Bias quarrels with the blind administrator finding but presents no evidence, much less clear and convincing evidence to overcome that finding. And this Court agrees with the Ohio Eighth and Tenth Districts that proof of compliance with Ohio Revised Code § 2933.83 shows compliance with the Constitution as interpreted in *Neil*.

Petitioner quibbles with the finding of constitutionality.  He asserts the administrator suggested Jaw.L. pick photo number six, but the language used does not bear that weight.  We know no. 6 was Bias but the administrator did not know that.  His questions to Jaw.L. about the identification were non-leading, appropriate attempts to discern how certain the witness was.

Because Petitioner has not shown the identification procedure was unduly suggestive, the Tenth District's conclusion to the contrary is entitled to deference and Ground Four should be dismissed with prejudice.

**Ground Seven:  Insufficient Evidence to Support the Gang Specification**

All of the counts of the Indictment (except for having weapons under disability) had attached specifications that the offenses were committed while Bias was participating in a criminal gang as defined in Ohio Revised Code § 2923.41 of the Ohio Revised Code, to wit:  the Duece Duece Bloods and/or Bloods.  (Indictment, State Court Record, ECF No. 15, Ex. 1).  In his Seventh Ground for Relief, Petitioner asserts that insufficient evidence was presented to allow conviction on this specification.

The State apparently conceded at trial that it had not proven that the murders in this case were "gang-related" in the sense of being carried out to further gang interests.  Indeed, the prosecutor conceded in closing that they were random road rage shootings.  However, Petitioner argued in the Ohio courts that the statute should be interpreted to require that the predicate offense be gang-related.

> [A]ppellant asserts that "[c]ourts in other jurisdictions have construed gang penalty enhancement statutes as requiring some proof that the underlying offense was 'gang related' in order to survive constitutional scrutiny. * * * To avoid constitutional

concerns, the Ohio gang specification statute must be construed as requiring that the underlying offense must be 'gang related.' " (Appellant's Am. Brief at 14-15.)

*Bias, supra*, at ¶ 50.  The Tenth District rejected that argument, holding

{¶ 51} Furthermore, appellant's argument requires that we adopt legal standards established in other jurisdictions. This court, however, is bound by legal principles established in this state by the General Assembly, the Supreme Court of Ohio, and our own decisions. Initially, we note that the General Assembly did not include the term "gang related" in the text of R.C. 2941.142(A).

*State v. Bias, supra.*  Relying on the second sentence, Petitioner argues "If that is true, then *State v. Tanner*, 15 Ohio St. 3d 1 . . . (1984), is binding on this court." (Reply, ECF No. 25, PageID 1865).  In *Tanner* the Ohio Supreme Court held Ohio's driving under the influence statute to be constitutional.  Petitioner does not explain how *Tanner* could be relevant to this case.  He also relies on Ninth Circuit authority limiting how a gang-related specification can be proved.  But the Tenth District declined to hold that the State must prove the predicate offense is gang-related and we are bound by its interpretation of Ohio law.  *Bradshaw v. Richey, supra.*

Petitioner seems to be arguing that the gang specification statute is unconstitutional if it is not interpreted to require proof that the predicate offense is gang-related.  He relies on *Scales v. United States*, 3647 U.S. 203 (1961).  In that case the Supreme Court upheld the conviction under the Smith Act for belonging to the Communist Party of the United States of a person knowing and intending the aim of the organization, the violent overthrow of the government of the United States.

*Scales* does not support Petitioner's position.  The holding instead is that the State may punish knowing membership in an organization who aims and purposes are illegal.  The State certainly offered sufficient evidence to prove Bias was at the time a member of the Deuce Deuce Bloods[1] and that that organization was a criminal gang.

---

[1] Petitioner's protestation that he was not a member of the 22nd degree subset of the Deuce Deuce Bloods is immaterial.

Petitioner's Seventh Ground for Relief should be dismissed.

**Ground Eight:  Insufficient Evidence of Identity**

In his Eighth Ground for Relief, Petitioner asserts his pretrial identification by Jaw.L. is

too vague and ambiguous to support conviction.  In the Tenth District he raised this claim as both

an insufficiency of the evidence and conviction against the manifest weight of the evidence claim

in his First Assignment of Error.  The Tenth District decided these claims as follows:

> {¶ 29} In his first assignment of error, appellant contends that his
> convictions were not supported by sufficient evidence and were
> against the manifest weight of the evidence. We disagree.
>
> {¶ 30} "The legal concepts of sufficiency of the evidence and weight
> of the evidence are both quantitatively and qualitatively different."
> *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997),
> paragraph two of the syllabus. "Sufficiency of the evidence is the
> legal standard that tests whether the evidence [introduced at trial] is
> legally adequate to support a verdict." *State v. Kurtz,* 10th Dist. No.
> 17AP-382, 2018-Ohio-3942, 2018 WL 4677567, ¶ 15, citing
> *Thompkins* at 386, 678 N.E.2d 541. Whether the evidence is legally
> sufficient to support a criminal conviction is a question of law, not
> fact. *Id.*, citing *Thompkins* at 386, 678 N.E.2d 541. In making that
> determination, "[t]he relevant inquiry is whether, after viewing the
> evidence in a light most favorable to the prosecution, any rational
> trier of fact could have found the essential elements of the crime
> proven beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d
> 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus,
> following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61
> L.Ed.2d 560 (1979).
>
> {¶ 31} "In a sufficiency of the evidence inquiry, appellate courts do
> not assess whether the prosecution's evidence is to be believed but
> whether, if believed, the evidence supports the conviction." *Kurtz* at
> ¶ 16, citing *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126,
> 767 N.E.2d 216, ¶ 79-80. "The court essentially assumes the state's
> witnesses testified truthfully and determines whether that testimony
> satisfies each element of the crime." *State v. Davis,* 10th Dist. No.
> 18AP-921, 2019-Ohio-4692, 2019 WL 6041116, ¶ 38, citing *State*

---

It is membership in the larger organization on which the State relied.  Bias has also given no record reference to proof
of what "subset" of the Deuce Deuce Bloods he may belong to.

*v. Bankston,* 10th Dist. No. 08AP-668, 2009-Ohio-754, 2009 WL 418770, ¶ 4.

{¶ 32} In contrast, a manifest weight of the evidence challenge requires a different analysis. The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *Thompkins* at 387, 678 N.E.2d 541. Although there may be sufficient evidence to support a judgment, an appellate court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *Id.*

{¶ 33} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris,* 10th Dist. No. 13AP-770, 2014-Ohio-2501, 2014 WL 2583023, ¶ 22, citing *Thompkins* at 387, 678 N.E.2d 541, citing *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, 678 N.E.2d 541, quoting *Martin* at 175, 485 N.E.2d 717.

{¶ 34} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis, i.e., a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. Braxton,* 10th Dist. No. 04AP-725, 2005-Ohio-2198, 2005 WL 1055819, ¶ 15, citing *State v. Roberts,* 9th Dist. No. 96CA006462, 1997 WL 600669 (Sept. 17, 1997). "[T]hus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Id.,* citing *Roberts.* Accordingly, we will first examine whether appellant's convictions are supported by the manifest weight of the evidence. *State v. Sowell*, 10th Dist. No. 06AP-443, 2008-Ohio-3285, 2008 WL 2600222, ¶ 89.

{¶ 35} Appellant does not contest the evidence establishing that on December 4, 2017, an individual filed multiple shots from the window of a gray Chevy Malibu at the occupants of a Honda CR-V traveling behind it and that the shooting ultimately resulted in the deaths of Q.S. and S.C. Save for the gang specifications, appellant

44

does not argue that such evidence is insufficient to prove the elements of the offenses for which he was convicted. Rather, appellant argues that the prosecution failed to prove that he was the shooter. Specifically, appellant argues that the prosecution primarily relied on two pieces of evidence to establish that he was the shooter, i.e., Jaw.L.'s identification of him in the photo array and the presence of his DNA on the hat found on the ground near the scene. Appellant maintains that neither establish his identity as the shooter beyond a reasonable doubt.

{¶ 36} In a criminal matter, the prosecution must prove every element of the crime charged beyond a reasonable doubt, including the identity of the person who committed the crime. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15; *State v. Johnson*, 9th Dist. No. 13CA010496, 2015-Ohio-1689, 2015 WL 1962863, ¶ 13 (identity of the perpetrator is an essential element that must be proved beyond a reasonable doubt). As with any other element of a crime, identity of the perpetrator may be established by direct or circumstantial evidence. *656 *State v. Watkins*, 10th Dist. No. 14AP-807, 2016-Ohio-1029, 2016 WL 1034897, ¶ 22, citing *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, 2009 WL 1142271, ¶ 18. Direct evidence exists when a witness testifies about "a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from other evidence to the proposition that is offered to establish." *State v. Cassano*, 8th Dist. No. 97228, 2012-Ohio-4047, 2012 WL 3860656, ¶ 13. Circumstantial evidence, on the other hand, is the "proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." (Further citations omitted.) *State v. Wright,* 10th Dist. No. 18AP-770, 2019-Ohio-5201, 2019 WL 6877890, ¶ 22, quoting *State v. Robinson,* 10th Dist. No. 17AP-5, 2018-Ohio-1809, 2018 WL 2113628, ¶ 20. Direct and circumstantial evidence are of equal evidentiary value. *Robinson* at ¶ 20, citing *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492. "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence." *Cassano* at ¶ 13, citing *State v. Treesh,* 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).

1819{¶ 37} Here, Jaw.L.'s identification of appellant in the photo array constitutes direct evidence establishing appellant's identity as the shooter. "While identity is an element that must be proven by the state beyond a reasonable doubt, the credibility of witnesses and their degree of certainty in identification are matters affecting the

weight of the evidence." *State v. Reed,* 10th Dist. No. 08AP-20, 2008-Ohio-6082, 2008 WL 4966485, ¶ 48.

{¶ 38} Appellant challenges Jaw.L.'s photo array identification as unreliable. The factors that must be considered when evaluating reliability are: (1) the witness's opportunity to view the offender at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the offender; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the crime and the confrontation. *State v. Glenn-Coulverson,* 10th Dist., 2017-Ohio-2671, 90 N.E.3d 243, ¶ 52, citing *State v. Monford,* 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 39 (10th Dist.).

{¶ 39} Here, Jaw.L. indicated during the photo array procedure, held ten days after the shootings, that he observed the shooter for 4 or 5 seconds before he began firing multiple shots at the CR-V. Appellant argues that Jaw.L.'s initial statements that photographs 1, 2, 4, and 6 "looked familiar," that he was uncertain whether he had seen #6 prior to the shooting, and that he could not explain why he believed #6 was the shooter demonstrate "a high degree of hesitation and uncertainty regarding his ability to identify the shooter." (Appellant's Am. Brief at 7.) However, later in the photo array procedure, Jaw.L. definitively identified #6 as the shooter and confirmed to Carlson that he was positive in his identification.

{¶ 40} Moreover, even if there was some hesitation or uncertainty in Jaw.L.'s identification, " '[a] witness need not be free from doubt when identifying the perpetrator of a crime.' " *State v. Tucker*, 10th Dist. No. 15AP-434, 2016-Ohio-1033, 2016 WL 1051194, ¶ 13, quoting *State v. Cameron*, 10th Dist. No. 10AP-240, 2010-Ohio-6042, 2010 WL 5078278, ¶ 31. " '[A factfinder is] not so susceptible that [it] cannot measure intelligently the weight of identification testimony that has some questionable feature.' " *State v. Coleman*, 10th Dist. No 99AP-1387, 2000 WL 1724817 (Nov. 21, 2000), quoting *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Here, the trial court, as finder of fact, was in the best position to assess the evidence offered at trial in finding Jaw.L.'s photo array identification testimony to be credible, and such determination is entitled to great deference from a reviewing court. *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, 2015 WL 3857079, ¶ 37.

{¶ 41} Appellant also argues that Jaw.L.'s statements in his police interviews cast doubt on his photo array identification. Appellant

first challenges Jaw.L.'s statement that he "got a glimpse" of the shooter's face when the shooter leaned out of the window brandishing a firearm. (Tr. at 691, 701.) Appellant asserts it was unlikely Jaw.L. ever saw the shooter's face, given his statement that he ducked down when the shooter leaned out the window. However, we note that Jaw.L. also averred that Q.S. pushed him down on the seat *after* the bullets began hitting the car's windows. Under this scenario, Jaw.L. could have seen the shooter's face in the seconds before Q.S. pushed him down. The trial court, as the trier of fact, was in the best position to assess these seemingly inconsistent statements and resolve or discount them accordingly. *State v. Nivens,* 10th Dist. No. 95APA09-1236, 1996 WL 284714 (May 28, 1996).

{¶ 42} Appellant next argues that he does not fit the physical description of the shooter Jaw.L. provided during his police interviews. Jaw.L. stated that the shooter was a shade or two darker than himself. Appellant argues that a comparison of Jaw.L.'s skin tone in the video recordings of the police interviews with photographs of appellant from the "gang packet" establishes that appellant has a lighter complexion than Jaw.L. We find no merit in such comparison, given that the video recordings and the "gang packet" photographs were taken at different times, in different settings, with different photographic equipment, and with different lightings. Moreover, the trial court viewed the video recordings of Jaw.L.'s interviews, saw the photographs of appellant included in the "gang packet," and, as trier of fact, was in the best position to assess this evidence and assign it whatever weight it deemed appropriate.

{¶ 43} Appellant next points to Jaw.L.'s averment regarding the shooter's possible involvement with the westside Hot Boys gang. Appellant notes Smittle's testimony about appellant's association with a different gang, the Deuce Deuce Bloods, and his testimony that Carlson never asked him to follow up on the Hot Boys. Appellant also maintains that Carlson never investigated the members of the Hot Boys gang Jaw.L. mentioned in his police interviews.

{¶ 44} We note initially that Jaw.L.'s speculation about the Hot Boys appears to be based on the fact that he frequently saw the Malibu in Hot Boys' territory, i.e., the west side of Columbus; further, he mentioned the names of Hot Boys members only in response to Carlson's question about possible conflicts with others. In neither circumstance did he definitively state that the shooter was a member of the Hot Boys. Indeed, he stated that he had never seen

47

the shooter before that day. Further, as to Carlson's alleged failure to investigate the Hot Boys, we note Carlson's testimony that she investigated the named individuals but found no connection between them and the shootings. To the extent appellant suggests that Carlson's investigation into the Hot Boys was inadequate, we note that there is no accepted standard procedure governing police investigation. *658 *State v. Komora*, 11th Dist. No. 96-G-1994, 1997 WL 184758 (Apr. 4, 1997). Further, "[t]he weight to be given any failure by the police officers to employ adequate investigative techniques is for the [trier of fact] to determine." *Id.*, citing *State v. Larry*, 10th Dist. No. 95APA11-1418, 1996 WL 362090 (June 5, 1996).

{¶ 45} Finally, appellant argues that Jaw.L.'s statements to the police undermine his photo array identification because his description of the hat worn by the shooter, i.e., a "black skull cap type thing," (Tr. at 480; State's Ex. Y-1) does not match Carlson's description of the hat found at the scene, i.e., a "black beanie with gray trim" and "a gray fuzzy on top." (Tr. at 556-567; State's Ex. B-38.) We agree with the state that semantics regarding the precise description of the hat is far less important than the fact that Jaw.L. correctly described the shooter as wearing a hat. Further, the trial court heard Jaw.L.'s description of the hat, Carlson's description of the hat, and observed the hat at trial. (State's Ex. B.)

{¶ 46} Turning to appellant's specific contentions regarding the hat itself, he correctly notes that "[t]here was no direct evidence that the hat was left at the scene by one of the shooters." (Appellant's Am. Brief at 9.) However, circumstantial evidence establishes that fact. The hat was found in the street near the scene of the shootings, and Jones testified that it was "clean" and not "weathered," which suggested to him that it had not been in the street very long. In addition, other circumstantial evidence pertaining to the hat establishes that appellant was the shooter. Jaw.L. mentioned only one person firing shots out of the window of the Malibu, and he described the shooter as wearing a hat. The trial court, as trier of fact, could thus infer that the shooter lost his hat while leaning out the window. Moreover, and more importantly, appellant's DNA was found on the hat. Smith, the DNA analyst, testified that the hat contained DNA from two individuals and that appellant could not be excluded as the major contributor. Indeed, Smith opined that it was at least "292 octillion times" more likely that appellant was only one of the contributors than if the mixture was from two unknown, unrelated individuals. She further opined that Vinson could be excluded as a major contributor. Appellant challenges the DNA evidence on grounds that Smith admitted that appellant was one of

48

> two contributors to the mixture of DNA found on the hat, that others
> could have come in contact with the hat without depositing their
> DNA, that unswabbed portions of the hat could contain DNA from
> another major contributor, and that the DNA testing process could
> not definitively demonstrate when a particular DNA specimen was
> deposited. The trial court, as trier of fact, was free to believe all, part,
> or none of Smith's testimony. *State v. Moore,* 10th Dist. No. 19AP-
> 464, 2021-Ohio-1379, 2021 WL 1550470, ¶ 34.

*Bias, supra.*

Whether or not a conviction is against the manifest weight of the evidence is not a constitutional question and therefore not cognizable in habeas corpus. *Johnson v. Havener*, 534 F.2d 1232 (6th Cir. 1986).

On the other hand, an insufficiency of the evidence claim is cognizable in habeas corpus. *Jackson v. Virginia,* 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the
> light most favorable to the prosecution, any rational trier of fact
> could have found the essential elements of the crime beyond a
> reasonable doubt . . . . This familiar standard gives full play to the
> responsibility of the trier of fact fairly to resolve conflicts in the
> testimony, to weigh the evidence and to draw reasonable inferences
> from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *Smith v. Nagy*, 962 F.3d 192, 205 (6th Cir. 2020) (quoting *Jackson*). This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* (quoting *Jackson*, 443 U.S. at 324). This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.* A sufficiency challenge

should be assessed against the elements of the crime, not against the elements set forth in an erroneous jury instruction. *Musacchio v. United States*, 577 U.S. 237 (2016).

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008); *accord Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011)(en banc); *Parker v. Matthews*, 567 U.S. 37, 43 (2012). Notably, "a court may sustain a conviction based upon nothing more than circumstantial evidence." *Stewart v. Wolfenbarger,* 595 F.3d 647, 656 (6th Cir. 2010).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651, (2012)(per curiam); *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam).  The federal courts do not make credibility determinations in reviewing sufficiency of the evidence claims.  *Brooks v. Tennessee,* 626 F.3d 878, 887 (6th Cir. 2010).

Judge Holbrook's identity finding was entitled to and received appropriate deference from the Tenth District.  Both those decisions are entitled to deference from this Court which cannot re-weight the credibility of the witnesses.  In particular, the Magistrate Judge notes that, while DNA evidence is "only circumstantial," the likelihood the DNA on the recovered hat came from someone other than Petitioner is one divided by far more people than those who lived on Earth at the time of the crime.

The Eighth Ground for Relief should be dismissed with prejudice.


**Ground Nine:  Cumulative Evidentiary Errors Denied Due Process**


In his Ninth Ground for Relief, Petitioner asserts cumulative errors in the admission of evidence deprive him of due process.

The Magistrate Judge has already concluded objections to proof of unavailability are

procedurally defaulted without excuse.

The Sixth Circuit has held that cumulative error is not a cognizable constitutional claim after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"). *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011), *cert. denied,* 132 S.Ct. 2751 (2011), *citing Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005), *cert. denied sub nom. Moore v. Simpson,* 549 U.S. 1027 (2006).

Moreover, Petitioner has not established that there was error in the admission of evidence. He made the claims he raises here as part of his Fifth Assignment of Error and the Tenth District decided that claim against him on the basis of Ohio evidence law. *Bias, supra,* ¶¶ 129-39. This Court is bound by the Tenth District's decisions on matters of Ohio law.

Petitioner's Ninth Ground for Relief should be dismissed in part as procedurally defaulted and otherwise on the merits.

**Ground Eleven: Ineffective Assistance of Trial Counsel**

In his Eleventh Ground for Relief, Petitioner claims he received ineffective assistance of trial counsel. Petitioner raised ineffective assistance of trial counsel as his Seventh Assignment of Error on direct appeal and the Tenth District decided that assignment against him. *Bias, supra,* ¶¶ 154-60. In doing so, it applied the controlling Supreme Court precedent, *Strickland v. Washington,* 466 U.S. 668 (1984). Petitioner's burden, then, is to show the application was unreasonable. In part the Tenth District found that Bias was not prejudiced by his attorney's failure to object, largely because the objection would not have been sustained. This finding of lack of prejudice satisfies the second prong of *Strickland*. Overall, the Tenth District's conclusion on Bias's ineffective

assistance of trial counsel claims is not an objectively unreasonable application of *Strickland*.

Ground Eleven should therefore be dismissed on the merits.

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge recommends that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

February 22, 2024.

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Because this document is being served by mail, three days are added under Fed.R.Civ.P. 6, but service is complete when the document is mailed, not when it is received. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. #

Any party who objects is cautioned to comply with the instruction in the Order for Answer: "All papers filed in the case [after the State Court Record is filed] by either party shall include record references to the PageID number." (ECF No. 2, PageID 26). In particular the Magistrate Judge notes that in his Reply Petitioner often asserts "this Court" has done something, but then does not give a record reference or a reference to some other case in which this happened. Giving the citation enables the Court to check the context in which it is said to have acted.

s/ *Michael R. Merz*
United States Magistrate Judge